# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### July 19, 2011 Session

## STATE OF TENNESSEE v. CORDELL REMONT VAUGHN

**Appeal from the Circuit Court for Perry County**
**No. 2006CR932     James G. Martin, III, Judge**

---

**No. M2011-00067-CCA-R10-CD - Filed April 25, 2012**

---

In this extraordinary appeal, the State of Tennessee appeals the trial court's decision to order a new trial for the defendant, Cordell Remont Vaughn, after a jury returned a guilty verdict of first degree (premeditated) murder and sentenced him to life in prison without the possibility of parole. The trial court, after a hearing, granted the defendant's motion for a new trial on the grounds of prosecutorial misconduct. The State contends that the trial court abused its discretion because the court: (1) erroneously concluded that a State's witness committed perjury at a suppression hearing based solely on the defendant's submission of an affidavit that conflicted with that witnesses' testimony at that hearing, and (2) erroneously concluded that the outcome of the defendant's trial would have been different had this alleged perjury not occurred and had the defendant's motion to suppress been granted. The defendant responds that the trial court properly considered the affidavit and reached the proper conclusion concerning whether the State's witness committed perjury. Furthermore, the defendant contends that because the perjury at issue related to a constitutional right, the State was required to establish that the effect of the perjury was harmless beyond a reasonable doubt, and it failed to meet that burden. After careful review of the record, we conclude that the trial court abused its discretion by ordering a new trial on the grounds of prosecutorial misconduct because it failed to make any finding that the prosecution had, in fact, engaged in any misconduct. Moreover, the defendant has failed to show any prejudice resulting from the alleged perjury. Accordingly, the judgment of the trial court granting a new trial is reversed.

**Tenn. R. App. P. 10 Extraordinary Appeal; Judgment of the Circuit Court Reversed.**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR. and D. KELLY THOMAS, JR., JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Kim R. Helper, District Attorney General; and Stacey B. Edmonson, Assistant

District Attorney General, for the appellant, State of Tennessee.

Douglas Thompson Bates, III, Centerville, Tennessee, for the appellee, Cordell Remont Vaughn.

**OPINION**

On February 17, 2005, the defendant shot and killed the victim, Catricia Candace McPheters. The defendant was indicted for and convicted of first degree (premeditated) murder and sentenced to life in prison. This court reversed the defendant's conviction on appeal. *State v. Vaughn*, 279 S.W.3d 584, 599-602 (Tenn. Crim. App. 2008). After retrial, a jury again found the defendant guilty of first-degree (premeditated) murder, and he was sentenced to life in prison without possibility of parole.

As his second trial loomed, the defendant did not deny that he shot the victim seven times, thus causing her death. Rather, his chosen defense was that he was so intoxicated on phencyclidine ("PCP") at the time he committed the killing that he was mentally incapable of engaging in premeditation. This putative defense, however, faced a huge roadblock: a toxicology report from the Tennessee Bureau of Investigation ("TBI") crime lab stating that tests performed on blood taken from the defendant on the day of the shooting showed that there were no drugs or alcohol in the defendant's system.

Prior to the defendant's second trial, the defense filed a motion to suppress the blood test results on the grounds that the blood used in the tests had been taken from the defendant involuntarily and without his consent. The State defended against this motion on grounds that the exclusionary rule does not require suppression of blood taken without the defendant's consent under these circumstances, and also on the grounds that the blood at issue had been drawn at the behest of the defendant's attending emergency room physician for legitimate medical purposes. Therefore, the State argued, the act of taking the defendant's blood could not be imputed to the State.

At the defendant's suppression hearing on July 12, 2010, the following testimony was presented:

Dr. Andrew Averett testified that he was working at the Perry County Community Hospital in February of 2005. He testified that one night while he was working the defendant was brought to the emergency room for treatment because he "wasn't acting right." Dr. Averett testified that the defendant had a couple of superficial stab wounds to his anterior

-2-

chest when he arrived. Dr. Averett testified that he ordered a nurse to draw the defendant's blood because the defendant's "mental status wasn't normal." After the defendant's blood was drawn, Dr. Averett testified that he decided to send the defendant to Vanderbilt Hospital for further treatment.

On cross-examination, Dr. Averett testified that he had ordered the defendant's blood drawn because he had been told by his nurse that when the defendant arrived at the hospital he had stated that he was under the influence of "PCP." Dr. Averett testified that he was not planning to test the blood itself at the hospital. When asked where he planned to send the blood for testing, Dr. Averett initially testified that it would have been normal for the nurse to give the blood to one of the police officers, who would then take it to the state laboratory. When asked whether it was normal for the police to receive a patient's blood any time it was drawn at the hospital, Dr. Averett initially stated that he would give a patient's blood to the police when "I have a lady laying 15 feet from [me] that had a bullet entered into her back and [the patient], when asked what happened, respond[ed], 'I shot her.'" However, when he was pressed concerning whether the defendant's admission to the killing was a factor in his decision to request that his nurse draw the defendant's blood, the doctor claimed that it was not. Dr. Averett testified that he ordered the blood drawn so that when the defendant arrived at Vanderbilt Hospital, "they would be getting . . . a picture image of what was in his blood at the time he was [at Perry County Community Hospital] because with toxicology, time matters." Moreover, "[s]omething that's in your blood now may not be in your blood two or three hours from now." Dr. Averett further testified that he wanted the blood sent to the state toxicology lab because "they have the best toxicology lab in the state," and "Vanderbilt would have access to that," although he acknowledged that it would take some time for any testing done at TBI lab to be completed.

When asked if he had ever talked with the police concerning the defendant's blood, Dr. Averett testified that he had talked with an officer about the blood on "Thursday or Friday," but did not further specify when the conversation occurred. Dr. Averett further testified that he had never followed up on the defendant's blood work because he never had any reason to do so. Dr. Averett testified that although he never asked for the defendant's consent before drawing his blood, the defendant never asked him not to do so.

As his cross-examination continued, Dr. Averett continued to testify that he requested the defendant's blood solely for medical purposes. The witness was then shown a copy of the defendant's emergency room in-take form. The witness read aloud from that form, which stated that the defendant, "admits to PCP use yesterday a.m.," and which requested that the defendant undergo a "tox screen per TBI." This form was entered in the evidence.

On redirect examination, Dr. Averett testified that he did not write the phrases "admits

-3-

to PCP use" and "tox screen per TBI" on the defendant's emergency room form. He testified that it was his belief that those words had been written by Nurse Judy Briley, who he believed was the nurse on duty that night. Dr. Averett testified that he never in fact ordered a "Tox screen per TBI," as the form stated, and that he believed that this writing was the result of some "miscommunication between [him] and the nurse." Dr. Averett testified that he had "no recollection of [a police officer on the scene at the hospital] asking me to get any kind of toxicology screen on [the defendant]."

The State's second witness was Special Agent Jerry Terry, who testified that he was retired from the TBI. Agent Terry testified that during his time at the TBI he investigated a case involving the defendant and the victim. He testified that on the night of the shooting, he arrived at the Perry County Community Hospital in response to a call, but had no information about the case. He testified that a nurse told him that he needed to talk to the defendant. He testified that while he was at the hospital, Dr. Averett was there as well, tending to the defendant. Agent Terry testified that he never asked Dr. Averett to draw the defendant's blood. He testified that as he was leaving the hospital, a nurse gave him a copy of the defendant's intake sheet and the defendant's blood. He testified that he personally carried this blood to the TBI crime lab and turned it over.

On cross-examination, Agent Terry testified that he was surprised to receive the defendant's blood from the nurse. The defendant's counsel cross-examined Agent Terry extensively concerning whether he had asked for the defendant's blood, and pointed out to the witness that the defendant's hospital intake form stated that the defendant's blood was drawn "per TBI." Agent Terry continued to assert that he never requested the defendant's blood. When asked when he had last seen the defendant's hospital intake form, Agent Terry testified that he thought it was the previous week when he met with an assistant district attorney.

Following this testimony, Agent Terry was asked several questions by the trial court concerning a document entitled: "Tennessee Bureau of Investigation Forensic Services – Crime Laboratory – Alcohol/Toxicology Request." Agent Terry testified that he filled out this form in its entirety except for the letters "PCP" and the phrase "[c]ollected February the 17th, 2005 at 19:35 p.m. by Tara C. Harris MCT." He testified that he did not remember whether he had given that form to the hospital. He further testified that he also did not remember whether he had received the form from the hospital (as various sheriff's offices would sometimes distribute these forms to hospitals), but that he was sure he did not have the form with him when he went to the hospital. He testified that he could not remember whether he left the hospital with the form. In response to further questioning from the court, the witness testified that he could clearly remember the day in question and was sure he had not requested the defendant's blood.

Following this testimony, the trial court announced its legal conclusion: If the defendant's blood was drawn as part of the defendant's treatment, it would be admissible, but if the blood was drawn at the request of the State of Tennessee (or if the hospital acted as the State's agent when it withdrew the blood), then the Fourth Amendment would be implicated and a question would arise as to whether a warrant was required. In resolving the factual dispute over whether the State had requested the defendant's blood, the trial court noted that "there are some real inconsistencies here" because of the conflict between the testimony of Agent Terry (to the effect that he did not request the defendant's blood) and (1) the defendant's emergency room intake form, which stated "tox screen per TBI," and (2) the alcohol/toxicology request form, which was entirely in the Agent Terry's handwriting except for the part stating who had taken the sample and when it was taken. "Notwithstanding the[se] inconsistencies," the trial court found that "the sample in question was, in fact, drawn for the purpose of diagnosis and treatment, primarily based upon the testimony of Dr. Averett, because he wanted to essentially establish a baseline . . . for later comparisons with whatever was found at Vanderbilt." The trial court stated that this conclusion made "logical sense." Although the trial court further observed that, "what doesn't make any logical sense is why [the doctor] would send [the defendant's blood] to the TBI knowing it could take a very long time to get back," the trial court nonetheless denied the defendant's motion to suppress.

Following the suppression hearing, the State filed a *motion in limine* to preclude the defendant from questioning Special Agent Terry and Dr. Averett "about the collection of the defendant's blood." The State explained in its motion that "the matter [sic] in which the blood was collected [wa]s a question of law not a question of fact for the jury to consider," and that permitting the defendant to pursue the issue "may cloud the jury's perception and may mislead the jury into believing the blood was improperly collected and tested." The record is silent as to whether the State pursued this motion and whether it was granted or denied.

At various points during the defendant's trial on July 14-16, 2010, the defendant renewed his motion to suppress the toxicology results. Each time, the trial court continued to overrule the motion to suppress, and continued to explain its reasons for doing so. During the State's case-in-chief, both Dr. Averett and Agent Terry testified, along with numerous other witnesses. None of these witnesses referenced or raised the issue of the defendant's negative toxicology test, and it was never entered into evidence. The State completed its case-in-chief at the close of the second day of the defendant's trial.

While the trial court was addressing preliminary matters on the third day of trial, the prosecutor announced that on the previous evening she had tracked down and spoken on the phone with Nurse Tara Harris, who had taken the defendant's blood sample on the day of the murder. The prosecutor explained that she had asked the police to track down Nurse Harris in hopes that the nurse could supply valuable testimony establishing that the blood that was

-5-

given to Agent Terry on the day in question had, in fact, come from the defendant, in case the defense called the "chain of custody" of the blood into question – a concern that had been raised by the trial court earlier in the proceedings. Because the State had already rested its case, it sought to have Ms. Harris placed on the rebuttal witness list.

The prosecutor further stated that when she had spoken with Nurse Harris, Nurse Harris had told her that she remembered the day of the incident because it was the first time she had dealt with a dead patient. The prosecutor further stated that Nurse Harris remembered a TBI agent being in the room while Dr. Averett was treating the defendant, and that she had heard them talking. The prosecutor claimed that Nurse Harris had stated that she did not recall many specifics of that conversation because "she was very upset over the [death] of the victim and she just really wasn't paying close attention." However, the prosecutor stated that Nurse Harris had told her that she remembered that Dr. Averett had told her to draw the defendant's blood and "that she thinks she heard the TBI agent say, 'we're going to need blood.'"

After hearing this announcement, defense counsel stated to the trial court, "We do not renew our motion to suppress [the defendant's toxicology screen]. In fact, we have no more proof going forward. We will be resting." The trial court stated to defense counsel that if Nurse Harris "overheard a conversation where the TBI agent said, I think we need blood, and the blood draw was a result of that comment, then it would completely change the court's ruling on the motion to suppress." The trial court further stated, "I am prepared to do whatever is proper to make sure . . . [the defendant] receive[s] a trial that's as clean as I can possibly make it." The trial court then offered to release the jurors for the day so that both sides could talk with Nurse Harris. The defendant's counsel discussed the issue with his co-counsel off the record and afterward stated, "[w]e are not asking for a delay to examine Ms. Harris . . . we are not asking for a mistrial . . . we are moving forward."

The defense elected not to put on any proof. The defendant was advised of and waived his right to testify in his own defense pursuant to the procedures described in *Momon v. State*, 18 S.W.3d 152, 162-64 (Tenn. 1999), and the case was submitted to the jury. The jury deliberated and returned with a unanimous verdict of guilty on the charge of first-degree (premeditated) murder. The penalty phase was held before the same jury later that day, and the State presented evidence of an aggravating factor – that the defendant's act of repeatedly shooting the victim had also endangered the lives of a woman and a little girl who were in the house at the time the shots were fired. The defense argued that several mitigating factors were applicable, including voluntary intoxication. The jury was instructed concerning Tennessee law to the effect that no person could be sentenced to life without the possibility of parole unless the jury unanimously found that the State proved the existence of an aggravating circumstance beyond a reasonable doubt, and that this aggravating circumstance outweighed

any mitigating circumstances. The jury retired for further deliberations and unanimously sentenced the defendant to life without the possibility of parole later that same day.

On August 23, 2010, the defendant filed a motion for new trial on four different grounds including prosecutorial misconduct, and more specifically, on the grounds that the State had committed misconduct by presenting the perjured testimony of Agent Terry at the defendant's hearing on his motion to suppress. On September 3, 2010, the defendant submitted an additional letter to the trial court containing, *inter alia*, a two page affidavit from Nurse Tara Harris. In the affidavit, Ms. Harris stated that she: (1) "remember[ed] the events as follows well and ha[s] never told anyone [that she] was at all uncertain about these events; (2) was on duty on the day in question, saw a TBI officer in the ER, and "heard Dr. Averette ask the TBI officer if he wanted blood [and] the TBI officer sa[y] 'yes'"; (3) took the defendant's blood while the TBI officer watched after Dr. Averette instructed her to do so; and (4) spoke with an Assistant District Attorney on July 15, 2011, and "told her the same thing."

On November 23, 2011, the trial court held a hearing on the defendant's motion for a new trial. No new evidence was taken at this hearing; Nurse Harris was not present and did not testify. Prior to hearing arguments, the trial court stated, "Had the nurse's testimony been presented to the court at the suppression hearing, there's no question in the court's mind it would've suppressed the evidence. End of story." The trial court further stated, "The question then becomes, does that decision that the court would've made to suppress the evidence warrant a new trial under the facts and circumstances of this case?" At this point, the State spoke up and attempted to direct the trial court's attention to precedent supporting the proposition that even if a police officer had requested the blood, as long as a doctor was also requesting blood for medical purposes, the test results would still be admissible. The trial court continued, and relying on Nurse Harris' affidavit, stated, "here's the problem," "[t]he facts were, apparently, that Agent Terry was in the room with [Dr.] Averett . . . from the time Agent Terry got there until that blood was drawn and handed to Agent Terry." Moreover, "from what the affidavit indicates, Agent Terry was asked, 'do you want a blood draw' and his answer was yes, and the nurse responded and drew the blood and handed it straight to Agent Terry." As a result, the trial court concluded that "under the facts and circumstances that I believe now existed, there would not have been a dual purpose." The State argued that there was a dearth of caselaw on the subject, explaining that generally, "It would be illogical for a TBI agent to even ask for blood if it's not a DUI or vehicular homicide case," and, "That's one reason why there's no case law dealing with blood except in those cases." The trial court responded there may have been a good reason for the State to do so in this particular case – to determine if the defendant was malingering.

Moving on, the trial court stated, "there's also an allegation raised in this motion, or

a suggestion, at least, that there was prosecutorial misconduct." The trial court observed that during the trial on July 16, 2010, when the State "discussed this issue with the nurse, the court did not at that time suggest or believe that there was any kind of prosecutorial misconduct. Based upon this record, I still don't have that impression, I do not." The court stated that despite its conclusion that the "testimony offered at the suppression hearing . . . by Agent Terry . . . was false," it "was not, in the court's mind proffered by the State of Tennessee knowing it to be incorrect or false." That the State had decided to track down Nurse Harris in response to a comment made by the trial court concerning the chain of custody of the defendant's blood "even more confirms, in the court's mind, the fact that there was no prosecutorial misconduct." The trial court observed that "the lesson here is for the court to shut its mouth."

After the trial court made these statements, the parties were permitted to offer argument, and the defense extensively discussed the burden of proof concerning prejudice that must be shown before a defendant's conviction may be reversed for prosecutorial misconduct. The defense essentially argued that the burden lay on the prosecution to prove that the misconduct had not affected the outcome of the trial. In this regard, the defense urged that its entire trial strategy was based on the trial court's ruling that the blood test was admissible, and that the defendant had used preemptory strikes to remove two hospital personnel from the jury pool because the defense thought they might be more likely to credit the blood test results. The defense also claimed that the State had committed additional misconduct because it had indicated that it was going to put both Agent Terry and Nurse Harris on the stand in its rebuttal case (presumably to establish chain-of-custody concerning the defendant's blood), while the State must have been aware that one of these two individual was not telling the truth. The defense offered no argument concerning the first three points raised in its motion for new trial.

In response, the State argued that "in light of . . . what the motion for a new trial states," "it doesn't appear that there was anything that the state did that was improper." The trial court responded, "I don't disagree with you." The State and the trial court then discussed whether the defendant could establish prejudice despite the fact that the report was never entered into evidence and that it would have been admissible in the State's rebuttal case even if it had been suppressed. The trial court pointed out that it would have been compelled to provide a limiting instruction under those circumstances. Although later in the hearing the trial court stated, "I've found that Agent Terry testified falsely," the trial court never returned to the issue of whether the prosecution had engaged in misconduct by presenting his testimony or placing him on its rebuttal witness list. Instead, the trial court stated, "the entire predicate for this trial is based upon false testimony," and "I've worked in the legal system too long to believe that a court should countenance perjured testimony in an important issue." The trial court stated that denying the defendant's motion for a new trial would require "rank

speculation" as to what the course and outcome of the trial would have been if the blood test had been suppressed and that the court "just cannot do that." Following these statements, the trial court granted the defendant's motion for a new trial.

On December 9, 2010, the trial court issued a written order granting the defendant's motion for a new trial on the grounds of prosecutorial misconduct. In its written order, the trial court denied the defendant's first three claims for relief, finding that sufficient evidence supported the defendant's conviction, that his conviction did not violate the Double Jeopardy Clause, and that Nurse Harris' affidavit was not "newly discovered evidence" merely because the State had failed to endorse her name as a witness at trial. In granting the defendant a new trial on the claim of prosecutorial misconduct, the trial court repeated its conclusion – based solely on the conflicting account given in the affidavit provided by Nurse Harris – that Agent Terry had committed perjury at the defendant's suppression hearing. The trial court also repeated its claims that (1) it would have suppressed the blood test absent Agent Terry's perjury, and (2) engaging in any analysis regarding what the jury might have done if the blood test had been suppressed necessarily required rank speculation. No portion of the trial court's written order examined the claims made or methods used by the prosecutors in pursuing their case against the defendant, nor did the trial court ever examine or discuss whether the prosecutors knew at the time, or later became aware of, any perjury that may have been committed by Agent Terry at the suppression hearing.

The State filed an Application for Extraordinary Appeal pursuant to Rule 10, which permits a party to seek an extraordinary appeal "if the lower court has so far departed from the accepted and usual course of judicial proceedings as to require immediate review." Tenn. R. App. P. 10(a). A panel of this court granted the State's application on January 27, 2011. *See State v. Cordell Remont Vaughn*, No. M2011-069-CCA-R10-CD (Tenn. Crim. App. Jan. 27, 2011) (order granting application for extraordinary appeal). That panel stated in its order that although "[t]he circumstances in which review is available under this rule . . . are very narrowly circumscribed," *id.* (quoting Tenn. R. App. P. 10, Advisory Commission comments), this court may grant such a motion after considering the following factors: "the ruling of the court below represents a fundamental illegality"; "the ruling constitutes a failure to proceed according to the essential requirements of the law"; the ruling is "tantamount to the denial of either party of a day in court"; "the action of the trial judge was without legal authority"; "the action of the trial judge constituted a plain and palpable abuse of discretion"; or "either party has lost a right or interest that may never be recaptured." *Id.* (citing *State v. Willoughby*, 594 S.W.2d 388, 392 (Tenn. 1980)). The panel further stated that "[h]aving considered the State's application including the relevant attachments, the Court concludes that an extraordinary appeal is warranted in this case." *Id.* (citing *State v. Perry*, 740 S.W.2d 723 (Tenn. Crim. App. 1987)).

Oral argument was heard concerning this matter by a different panel of this court on July 19, 2011. After careful review of the parties' arguments and the record in this case, our decision follows.

## ANALYSIS

Although our review of the record leads us to reverse the trial court's order, this court agrees that perjury undermines the basic foundation of our legal system and should not be countenanced. However, prior to reversing a defendant's conviction on the grounds of prosecutorial misconduct a trial court must – as the doctrine's name implies – find that the prosecution committed some form of misconduct. The trial court in this case not only failed to find that the prosecution had engaged in any misconduct, it affirmatively stated its belief at several points that the prosecution had not done so. The defendant is not entitled to a new trial on the grounds of prosecutorial misconduct if the prosecution has done nothing wrong. The trial court's decision to grant the defendant a new trial without making any finding that misconduct was in fact committed by the prosecution would at a minimum require this court to vacate and remand the trial court's judgment so that the court could hold an evidentiary hearing and make the requisite findings.

However, on this record, the defendant cannot show that the alleged perjury committed by the State's witness or any other alleged prosecutorial misconduct caused him prejudice. The defendant's complaint is based on the trial court's failure to suppress evidence that was never introduced at trial, and that would have been admissible in rebuttal even if it had been suppressed by the trial court. Consequently, we conclude that the trial court abused its discretion in granting the defendant's motion for a new trial.

"A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party. *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010). The trial court in this case applied an incorrect legal standard and when it granted relief to the defendant. A trial court may not order a new trial on grounds of prosecutorial misconduct without first finding, based on appropriate evidence, that prosecutorial misconduct occurred, and then determining that this misconduct prejudiced the outcome of the case against the defendant. The trial court failed to make the requisite finding that the prosecution had committed misconduct (and in fact found to the contrary), thereby applying the wrong legal standard.

It is well established that the State has a duty not to present false testimony, and if the State realizes that false testimony has occurred, it has a duty to correct it. *See State v. Spurlock*, 874 S.W.2d 602, 621 (Tenn. Crim. App. 1993). However, there is no evidence

-10-

appearing in the record that establishes that the State was aware that Agent Terry was going to give false testimony at the suppression hearing, or that it subsequently became aware that false testimony had occurred.

Even the trial court's underlying factual finding – that Agent Terry committed perjury at the suppression hearing – causes this court some concern on this record. While the trial court is tasked with primary responsibility for resolving factual disputes (including whether perjury has occurred), and its decisions in this regard are granted great deference on appeal, this deference arises from the fact that the trial court is in the best position to assess the witnesses' credibility because it has seen and heard their testimony as forged in the crucible of cross-examination. The trial court's factual finding concerning Agent Terry's perjury was based on the variance between his testimony and the content of a single affidavit, one which reads as well in the cold record on appeal as it did in the trial court. Nurse Harris was never subjected to cross-examination, the trial court had no opportunity to personally observe her demeanor or ask her any additional questions that may have been relevant, and Agent Terry was never afforded the opportunity to defend his statements or explain the variance between his statements and those contained in the affidavit. The fact that Agent Terry's testimony differed from the affidavit as well as from other circumstantial evidence, "is not in and of itself proof that [the witness] perjured himself." *State v. Jason Osmond Hines*, No. E2010-01021-CCA-R3-CD, 2011 Tenn. Crim. App. LEXIS 879, at *19 (Tenn. Crim. App. Nov. 30, 2011). The State argued that the apparent conflict between the two was the result of differing memories concerning events that had taken place many years earlier. It would seem prudent practice for the trial court to have given the State and the witness an opportunity to present evidence and be heard on this issue prior to finding that the witness had committed a serious crime.

But regardless, it is clear on this record that the trial court did not make the necessary additional factual finding that the prosecution was aware that Agent Terry either would commit or had committed perjury during the suppression hearing. Nor would the record have supported such a finding. The prosecution's act of filing an unusual *motion in limine* concerning the circumstances surrounding the defendant's blood draw, combined with the discrepancy between Nurse Harris' affidavit (which states that she had a clear memory of the day in question and never told anyone otherwise) and the representations made by the prosecutor to the trial court on the morning after the State rested its case (to the effect that she had talked to Nurse Harris and Nurse Harris had told her that she did not remember the day in question well because it involved her first patient fatality) are the only things in the record that might support such a finding. This circumstantial evidence, standing alone, is far from conclusive. Absent any meaningful evidence that the prosecution itself (as opposed to a single State witness) committed misconduct during the defendant's trial, the trial court abused its discretion by granting the defendant a new trial on the grounds of prosecutorial

misconduct.

"Moreover, prosecutorial misconduct does not amount to reversible error absent a showing that it has affected the outcome of the case to the prejudice of the defendant." *State v. Reid*, 164 S.W.3d 286, 321 (Tenn. 2005). The defendant has not and cannot make any such showing in this case. The alleged perjury affected, at most, the outcome of a motion to suppress evidence that was never actually introduced at the defendant's trial. The defense was free to question the prosecution's witnesses during the State's case, and it put forward no case itself. It is simply not possible to conclude based on these facts that the trial might have swung in the defendant's favor if, for instance, the defense had used its preemptory challenges on different jurors.

To the extent the defendant experienced any "chilling effect" in the presentation of his case based on fear that the blood test might enter play, that effect would have remained even had the trial court granted his motion to suppress, because the test would likely have been admissible as rebuttal evidence. *See, e.g., Harris v. New York*, 401 U.S. 222 (U.S. 1971) ("It does not follow . . . that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards."); *Walder v. United States*, 347 U.S. 62, 65 (1954) ("It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage. . . ."); *State v. Electroplating, Inc.*, 990 S.W.2d 211, 226 (Tenn. Crim. App. 1998) ("Evidence obtained through illegal means and . . . rendered inadmissible by the exclusionary rule, is nevertheless admissible to impeach the direct testimony of the defendant in a criminal case."). Although it is true that if the blood test had entered into evidence during the State's rebuttal case it would have been accompanied by an appropriate limiting instruction, *see, e.g., Electroplating*, 990 S.W. 2d at 225, the presence or absence of a limiting instruction concerning the blood test does not appear to have affected the defendant's litigation strategy in any meaningful way. Prior to resting its case, the defendant expressly declined the opportunity afforded by the trial court to interview Nurse Harris and determine if her testimony could provided an appropriate basis for a renewed motion to suppress. From this decision, it is safe to surmise that the defense either felt that the prosecution had failed to make its case entirely, or that if the blood test were to enter into evidence, it would be damaging even with a limiting instruction. Either way, the defense simply opted to present no case at trial, and this tactic appears to have been a sound trial strategy at the time it was made, not a clearly inferior strategy forced upon the defendant by prosecutorial misconduct.

The defendant seeks to avoid the consequence of his inability to establish prejudice on these facts by shifting the burden to the State. In this regard, the defendant claims that "once

a constitutional error has been established, the burden is upon the State to prove that the constitutional violation is harmless beyond a reasonable doubt," with citation to *Momon v. State*, 18 S.W.3d 152 (Tenn 1999). However, it is not clear that a constitutional error was ever established in this case. Even had Nurse Harris given testimony at the defendant's suppression hearing and been credited over Agent Terry, the State correctly points out that there is a general dearth of precedent concerning whether the State can collect a defendant's blood without a warrant under circumstances such as these, and consequently suppression may not have been required even if the blood draw was requested by Agent Terry. Regardless, the defendant sought relief in his motion for new trial by raising a claim of prosecutorial misconduct, not a claim concerning a violation of any underlying constitutional right, and the test for determining if prosecutorial misconduct constitutes reversible error is clear in placing the burden of establishing prejudice on the defendant.

Concerning prejudice, the defendant's argument boils down to the proposition that the jury should not have heard any evidence concerning a negative toxicology screen – and it did not. Because the defendant cannot establish that the jury's verdict was likely affected to his detriment by unfavorable evidence that was never put before it, we conclude that the defendant cannot establish prejudice and is entitled to no relief.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is reversed.

_____
JOHN EVERETT WILLIAMS, JUDGE

-13-